**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-68-ABJ** |
| **JASON FARRIS,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jason Farris to 27 months of imprisonment—the midpoint of the Guidelines range—three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.    INTRODUCTION

The defendant, Jason Farris, participated in the January 6, 2021 attack on the United States Capitol—a violent attack which interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Farris, a 45-year-old male from Arlington, Texas, was part of the mob that stormed the police line on the West Front of the Capitol. During the attack, Farris shoved J.W., a U.S. Capitol Police Officer, in the back, knocking him to the ground. At the time, J.W. was attempting to hold onto a metal barricade that other rioters were attempting to pull away from the police. Farris's actions caused J.W. to let go of the barricade, which other rioters then removed, creating a gap in the police line. Fifteen seconds later, J.W. was hit in the head by a heavy wooden beam thrown by a rioter. Minutes later, the violent mob streamed through that gap in the barricades that Farris had helped to create, and many rioters continued on to illegally enter the Capitol.

After assaulting J.W., Farris ascended the stairs to the Upper West Terrace of the Capitol. There, he climbed onto a mechanical window-washing machine attached to the front of the Capitol building and, with two other rioters, operated it so that it rose up several stories on the face of the Capitol building. As the crowd below cheered, Farris used the end of a flagpole to strike a glass window of the Capitol. After he came down, Farris illegally entered the Capitol building, where he remained for a short period of time. He exited only after he saw police officers with guns.

The government's recommendation of a 27-month sentence—the midpoint of the Guidelines range—reflects the gravity of Farris's conduct and serves the sentencing purposes laid out in 18 U.S.C. 3553(a), while also giving due consideration to his guilty plea.

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.        FACTUAL BACKGROUND

### A.        The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 25, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.        Jason Farris's Role in the January 6, 2021 Attack on the Capitol

On or about January 5, 2021, Farris traveled from Dallas, Texas to Baltimore, Maryland, via airplane. On January 6, Farris attended the "Stop the Steal" rally and then marched with other protestors to the Capitol.

Starting around 1:00 p.m., rioters near the Peace Circle breached a set of barricades which demarcated the restricted Capitol grounds, pushed past a handful of United States Capitol Police ("USCP") officers, and began flooding into the Capitol's Lower West Plaza. There, police officers had established a defensive line consisting of interconnecting metal bicycle racks running North to South, with officers, some in riot gear, stationed inside of the line between rioters and the Capitol Building. As the mob arrived at the Lower West Plaza, rioters began to force the police line back, assaulting officers and removing bicycle racks. This assault lasted for the next hour and a half and involved the use of fists, projectiles, and other weapons deployed against the police, who attempted to hold the line.



*Figures 1 through 4 - The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). The bottom right photo shows the nearly completed bicycle rack barrier line as of 1:39 p.m., which was later completely overrun.*

At approximately 2:14 p.m., Farris advanced to the front of the mob on the Lower West Plaza and directly confronted the police officers on the line.



*Figure 5: U.S. Capitol Police surveillance photo of Farris confronting police officers.*

Farris wore a black backpack on his chest, sunglasses, and a red baseball hat. Farris advanced

toward the line of police officers who were using metal bicycle racks to prevent rioters from advancing further into the restricted areas of the Capitol. Farris stated to the police officers: "I bet your family is proud of you, fucking faggot ass. You ain't shit. Ain't none of you shit."



*Figure 6: MPD Body-worn camera (BWC) video showing Farris using a slur to insult police officers.*

As he said this, Farris hit the baton held by one of the police officers.



*Figure 7: Farris striking a police officer's baton.*

5

Moments later, other rioters grabbed one of the metal bicycle racks being used by the police and attempted to pull it away from the police officers. Several police officers, including USCP officer J.W., held onto the bicycle rack to prevent it from being taken by rioters. Farris approached J.W. from behind and shoved him with two hands, knocking him to the ground. As he fell, J.W. was forced to let go of the bicycle rack, allowing rioters to remove it into the crowd.



*Figure 8: BWC video of Farris about to push Officer J.W. from behind.*



*Figure 9: BWC video of Farris shoving J.W. to the ground.*



*Figure 10: Immediately after Farris shoved J.W. to the ground.*

J.W. was not injured by being shoved to the ground. However, fifteen seconds later (at 14:14:38), after J.W. was helped to his feet by other officers, a rioter threw a large wooden beam at the police, which struck J.W. in the head. J.W. was wearing a riot helmet, but the impact of the

object knocked him to the ground and caused him to briefly lose consciousness. Two days later, J.W. he was diagnosed with a concussion.



*Figure 11: BWC video showing the wooden beam thrown by other rioters.*



*Figure 12: Third-party video showing J.W. being hit by the wooden beam less than fifteen seconds after he was shoved to the ground by Farris.*

After Farris assisted the other rioters to remove the bike rack barrier, this created a gap in the police line which officers attempted to fill with their bodies. But despite the officers' efforts, at approximately 2:28, rioters succeeded in overwhelming the police and surged through the gap

that Farris had helped to create, flooding into the West Plaza of the Capitol. The police line crumbled in multiple places, and a general retreat was called. Many of these rioters subsequently entered the Capitol building.



*Figures 13-14: Breakthroughs in the police line, including on the right flank, where Farris was located (top image) caused the entire police line to collapse. As the crowd swallowed individual officers (middle image), many were assaulted as they retreated.*

Farris advanced deeper into the Capitol grounds with the mob. He climbed up the external stairs and joined the mob on the Upper West Terrace of the Capitol. Farris mounted a mechanical window-washing platform that was suspended from the roof of the West side of the Capitol building. Farris and two other men caused the platform to ascend the side of the building while

members of the crowd below cheered. While on the window-washing platform, Farris used a flagpole to hit a window of the Capitol building several times in an apparent effort to break it.



*Figure 15: Third-party video of Farris using a flag pole to hit a window of the Capitol building.*

According to Farris, after he came down from the window-washing platform, he entered the Capitol building and stayed inside for a short amount of time. He exited after seeing police officers with guns.

### *Farris's Statements to the FBI*

On February 8, 2022, the date of his arrest, Farris spoke with the FBI. He told the FBI that when he arrived at the Capitol, he saw police firing pepper spray bullets and throwing flash bangs into the crowd. According to Farris, "it was apparent right then and there … that this isn't good, and I probably should have got out of there at that point." According to Farris, his friends left, but he did not.

10

Farris admitted that he was involved in a "confrontation" with a police officer and a "scuffle." However, he did not mention shoving J.W. and knocking him to the ground. To the contrary, Farris claimed that after consulting with an attorney, he was of the opinion that he had been pushed. Farris admitted that he operated the mechanical window-washing platform and struck the window with the flagpole. He denied that he broke the window, but he described the experience of operating the window-washing platform as "legend" and "cool," noting that the crowd below had cheered.

Farris admitted that he went inside the Capitol building. He claimed to have stayed inside for no more than two minutes and left only after seeing officers with guns.

## III.    THE CHARGES AND PLEA AGREEMENT

On March 8, 2023, a federal grand jury returned a five-count indictment charging Farris with, among other offenses, violating 18 U.S.C. § 111(a) (assault on a federal officer). On October 27, 2023, Farris pled guilty to that offense pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Farris now faces sentencing on one count of violating 18 U.S.C. § 111(a). As noted by the plea agreement and the Presentence Report (PSR) issued by the U.S. Probation Office, Farris faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, $2,000 in restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). The plea agreement and PSR set the base offense level at 14 pursuant to U.S.S.G. §2A2.2(a) and include the §3A1.2(c)(1) six-level enhancement because Farris's victim was a police officer and the offense was motivated by that status. PSR ¶¶ 31-33.

The PSR also includes a two-level reduction pursuant to § 3E1.1(a), since Farris demonstrated acceptance of responsibility by pleading guilty to the charge against him in this matter and through his disclosures made during the investigation, and a one-level reduction pursuant to § 3E1.1(b) since Farris's base offense level prior to taking § 3E1.1(a) is greater than 16.

The parties thus agree on the following Guidelines calculation:

Count Two: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | **Total** | **17** |

*See* Plea Agreement at ¶¶ 5(A).

U.S.S.G. § 4C1.1, the new guideline which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria, does not apply in this case because Farris engaged in violence on January 6. *See* U.S.S.G. § 4C1.1(a)(3) (adjustment applies only if, among other things, "the defendant did not use violence or credible threats of violence"). In several cases, other judges of this Court have defined

---

[2] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

"violence" as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm," or as the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5; *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (same). Here, Farris unlawfully shoved a police officer with sufficient force to knock him to the ground. The shove was also accompanied by fury and vehemence, as evident from the act itself and from Farris's hateful and obscene invective. This qualifies as violence under the above definitions or any other reasonable definition of violence and precludes application of § 4C1.1.

Further, due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite Farris's criminal history category.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 54. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 17, Farris's Guidelines

imprisonment range is 24 to 30 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors this calculation.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the recommended term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Farris's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Farris stepped out in front of other rioters to insult and interfere with police officers who were trying to protect the Capitol, using a slur and smacking an officer's baton. He did so at a key moment when the police were trying to maintain a line to prevent the mob from invading the Capitol. Farris assaulted J.W. by shoving him in the back with both hands. The assault was an intentional and successful effort to prevent J.W. from holding onto a police barricade that other rioters were attempting to pull away. As a result of Farris's actions, J.W. was knocked to the ground and forced to let go of the barricade, opening a gap in the police line through which other rioters later surged. This action contributed to collapsing the police line and assisted the mob to enter the Capitol building.

Further, Farris's assault on J.W. is especially serious because it contributed to J.W.'s being struck seconds later with a heavy wooden beam. While the government does not contend that Farris directly caused J.W. to be hit by the beam, such harm was reasonably foreseeable based on Farris's

14

actions. Indeed, it was predictable that after J.W. was violently shoved to the ground, he would be disoriented and less able to defend himself from attacks by other rioters. Farris's shoving J.W. to the ground increased his vulnerability to this dangerous attack, as well as to the attacks of Farris's fellow rioters, and put him in jeopardy of greater harm.

The nature and circumstances Farris's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 27 months' incarceration.

**B.     The History and Characteristics of the Defendant**

Farris is a 45-year-old male from Arlington, Texas with a history of prior arrests and convictions, which weighs in favor of a significant term of incarceration. Specifically:

- In 1997, Farris was convicted of Criminal Damage to Property and sentenced to 60 days imprisonment and one year of court supervision.

- In 1999, Farris was convicted of Possession of Cocaine and sentenced to 18 months of probation.

- In 1999, Farris was convicted of Driving Under the Influence and ordered to pay a fine.

- In 2001, Farris was convicted of Driving Under the Influence and was sentenced to two years of court supervision and a $883 fine.

- In 2001, Farris was convicted of Possession of Cannabis, Less Than 2.5 Grams and ordered to pay a $832 fine.

- In 2002, Farris was convicted of Driving on Suspended License and sentenced to 30 days' imprisonment.

- In 2003, Farris was convicted of Unlawful Possession of Firearm by a Felon and sentenced

15

to 25 months of probation.

- In 2003, Farris was convicted of Resisting a Peace Officer and ordered to pay a $343 fine.

- In 2003, Farris was convicted of Criminal Trespass Building and sentenced to two days' Imprisonment and a $210 fine.

- In 2005, Farris was convicted of Transport/Carry Alcoholic Liquor/ Passenger and ordered to pay a $75 fine.

PSR ¶¶ 42-53.

Thus, Farris's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a history of prior convictions and arrests. Further, the Guidelines range does not reflect these convictions because they do not result in points for purposes of Farris's criminal history category. The Court should therefore give these convictions extra weight, in comparison with the circumstance where a defendant's Guidelines range already reflects the history of convictions. Farris's criminal history thus weighs in favor of the recommended term of incarceration.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports the recommended sentence of incarceration. Farris's criminal conduct on January 6 was the epitome of disrespect for the law. As this Court observed in *United States v. Kevin Cronin,* 22-CR-233-ABJ, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." Tr.

16

06/09/23 at 20. Understanding Farris's conduct within this context further demonstrates the seriousness of the offense and the need for a sentence of imprisonment that promotes respect for the rule of law.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of incarceration.

First, although Farris has a criminal history category of I, his prior convictions, including resisting a police officer, demonstrate a pattern of disrespect for the law and suggest that greater deterrence is needed.

Second, while Farris agreed to plead guilty, the statements he made to the FBI minimized his offensive conduct and failed to fully acknowledge his responsibility. For example, while Farris admitted that he was involved in a "confrontation" with the police and a "scuffle," he failed to mention that he shoved a police officer to the ground. He further claimed that he had been pushed,

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

as if to suggest that his contact with J.W. was involuntary—which is clearly contradicted by the video evidence. Farris also expressed that operating the window-washing machine, during which he attempted to smash a Capitol window, was "cool."

Finally, Farris has failed to provide any tax records as requested by the Probation Officer for use in the PSR. *See* PSR ¶ 109. At best, this constitutes a continued failure to take full responsibility for his actions by cooperating in this process. At worst, it suggests that Farris may not have paid all the taxes he owed during this period.

Farris's failure to fully own up to his actions suggests the need for a sentence that deters him from committing future crimes.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

18

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Kevin Creek*, 21-CR-645, the defendant pled guilty to one count of violating 18 U.S.C. § 111(a)(1) for actions taken near the same time and location as Farris. Like Farris, Creek made a deliberate choice to join the mob even after his friends held back, despite evidence that a violent conflict was underway. Also like Farris, Creek hit officers, pushed through the bike rack barrier, and played a pivotal role in breaching the police line and opening the floodgates to the mob's entry into the Capitol. Unlike Farris, however, Creek never entered the Capitol building. Nor did Creek engage in further violence against property comparable Farris's effort to break a Capitol window with a flagpole. While noting that Creek had honorable military service, character letters, and appeared to be deeply committed to his family and community, Judge Friedrich sentenced Creek to 27 months' imprisonment, the midpoint of the Guidelines range.

In *United States. v. Cale Clayton*, 22-CR-139, Judge Lamberth sentenced another defendant who assaulted police officers on the West Front of the Capitol to 30 months of incarceration. Like Farris, Clayton verbally harassed police officers on the Upper West Terrace, yelling taunts such as "You guys are losing a lot of bodies. We're coming in, one way or another, we're coming in." At one point, Clayton grabbed an officer's shield and stole an officer's baton. When officers attempted to retrieve the baton from Clayton, he assaulted one of them. Like Farris, Clayton minimized his actions when interviewed by the FBI afterwards. Notwithstanding significant mitigation evidence presented at sentencing, Judge Lamberth sentenced Clayton, who pled guilty to two counts of 18 U.S.C. § 111(a)(1), to 30 months in prison.

In *United States v. Salvadore Vassallo*, 22-CR-325, this Court sentenced the defendant to 18 months in prison after he pled guilty to one count of 18 U.S.C. § 111(a)(1), for conduct less egregious than Farris. Like Farris, Vassallo violently shoved a police officer, nearly knocking him off a wall where he was standing. And like Farris, Vassallo's Guidelines range for the assault was 24-30 months. Unlike Farris, however, there was no allegation that Vassallo's assault was part of a joint effort with other rioters to break a hole in the police line; or that Vassallo attempted to destroy property by, for example, hitting a window with a flagpole; or that Vassallo illegally entered the Capitol building. These additional aggravating factors warrant a more serious sentence for Farris and justify the Government's recommendation of 27 months.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, J.W., did not suffer bodily injury directly as a result of Farris's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Farris must pay $2,000 in restitution, which reflects in part the role Farris played in the riot on January 6.[6] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Farris's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 14.

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of imprisonment, a term of supervised release of three years, restitution of $2,000, and a mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


By:     */s/ Brian Morgan*
        BRIAN MORGAN
        Trial Attorney
        NY Bar No. 4276804
        601 D Street NW
        Washington, DC 20530
        Brian.morgan@usdoj.gov
        (202) 305-3717

24